*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CARNIGEE TRUESDALE,

Plaintiff-Appellee,

v

WILLIAM KENNETH HOWARD,

Defendant-Appellant.

UNPUBLISHED
September 19, 2024

No. 368394
Oakland Circuit Court
LC No. 2016-847927-DM

Before: LETICA, P.J., and GARRETT and FEENEY, JJ.

PER CURIAM.

This case involves a contentious custody dispute that arose after the parties' divorce in 2017 and continued throughout these proceedings. Ultimately, the trial court granted legal and physical custody of the children to plaintiff, Carnigee Truesdale, and defendant, William Kenneth Howard, appeals that ruling as well as its order granting Howard supervised parenting time. We affirm because the trial court's findings of fact were not against the great weight of the evidence, the trial court committed no clear legal error, and it did not abuse its discretion.

## I. BACKGROUND

Truesdale and Howard married in September 2010, and had AH and MH during the marriage. The family lived together in Oxford, Michigan until the parties divorced in June 2017 pursuant to a consent judgment of divorce. The consent judgment granted Truesdale and Howard joint legal and physical custody of the children. At that time, the parties agreed to a "2-2-3" parenting-time schedule in which the children spent two days a week with each parent, and the parents alternated parenting time for the remaining three days of each week. After the divorce, Howard decided to move to Southfield, which is about 45 minutes away from where Truesdale remained in Oxford. The parties' relationship quickly deteriorated to the degree they did not effectively communicate or make joint decisions about the children. Children's Protective Services (CPS) also received numerous allegations of child abuse by Howard.

The parties also filed many motions following the consent judgment, as this Court noted in a previous opinion:

Disputes between the parties have been ongoing since the divorce, with each of them filing numerous competing motions concerning custody, parenting time, and the children's school enrollment. Numerous Child Protective Services investigations were made against [Howard] for allegations of physical or mental abuse, but only two were substantiated—one for corporal punishment and one for threatening the children with a belt and taking them to an age-inappropriate reenactment of slavery. . . .

In February 2019, [Howard] moved to enroll the children in Avondale schools, a district equidistant between the parties' residences, and [Truesdale] responded by cross-moving for primary physical custody, to establish the children's residence and school enrollment in Oxford, and for [Howard] to have alternating weekends and holiday parenting time. The trial court granted [Howard's] request, and the children were enrolled in Avondale. However, for the 2019-2020 school year, one child was waitlisted for Avondale schools, the parties each filed competing emergency motions, and the trial court ordered that the children temporarily attend Oxford schools pending acceptance at Avondale. When [Truesdale] later filed a motion for the children to remain in Oxford schools, the court denied her request, ordering the children to be enrolled in Avondale pursuant to the previous order.

\* \* \*

[Truesdale] filed a new motion to change custody, and [Howard] moved to readjust the parenting-time schedule . . . to alternating weeks. [Truesdale] again moved to enroll the children in Oxford schools, and [Howard] opposed the motion, relying on the last court order enrolling the children in Avondale. [*Truesdale v Howard*, unpublished per curiam opinion of the Court of Appeals, issued September 22, 2022 (Docket No. 360205), pp 1-2.]

The trial court held three evidentiary hearings between August 5, 2021, and November 5, 2021, to address Truesdale's motion to change custody and Howard's motion to modify parenting time. On January 19, 2022, the trial court issued an opinion and order on the motions. As this Court explained:

[T]he court entered an order denying [Truesdale's] motion to change custody, but altering the parenting-time schedule, and ordering the children to be enrolled in Oxford schools.

The court determined that the children had an established custodial environment with both parents, thus requiring any change in custody to be supported by clear and convincing evidence. The court concluded that [Truesdale] failed to meet her burden to show that a change in custody was in the children's best interests by clear and convincing evidence. However, the court concluded that the children's best interest did warrant, by a preponderance of the evidence, a change to the parenting-time schedule. Thus, it ordered that during the school year, [Howard] had parenting time every other weekend with the possibility of additional

time on Mondays or Fridays that the children did not have school and [Truesdale] was working, as well as parenting time every Wednesday evening. The remaining time the children would be with [Truesdale], and the parties would alternate week by week during the summer.

The court also determined that the children's best interests supported reenrolling them in Oxford schools. The court did not believe that this change would alter the children's established custodial environments with both parties, making the applicable standard of proof a preponderance of the evidence. The court reasoned that [Truesdale] met this burden by evidence that the children were negatively impacted by attending Avondale schools, noting the reduced travel time and increased opportunity for community involvement and social interaction in Oxford schools. [*Truesdale*, unpub op at 2.]

Howard appealed the trial court's order in this Court and argued that "the trial court erred because (1) the modifications to parenting time and school enrollment altered the children's established custodial environment and were not supported by clear and convincing evidence, and (2) the court improperly evaluated the children's best interests." *Id*. at 1. In its opinion, the majority agreed with Howard and ruled that the trial court applied the wrong legal framework in its analysis. *Id*. at 6. This Court further ruled that the modification of parenting time coupled with the change of schools altered the children's custodial environment, reduced Howard's time with the children from 182 days a year to just over 82 days, and necessarily impacted the "character of his interactions with the children." *Id*. at 6-7. For those reasons, this Court vacated the trial court's order and remanded the case for the trial court to conduct further proceedings. *Id*.[1]

Following this Court's ruling, on October 17, 2022, the trial court ordered the parties to return to the "2-2-3" parenting time schedule until the court could reconsider the issues raised by the parties. But the trial court concluded that, in light of Howard's "restored parenting time," the great weight of the evidence supported the children's enrollment in Oxford schools. The trial court then scheduled evidentiary hearings to consider facts that rose since the evidentiary hearing in November 2021.

Over time, the parties continued their pattern of failing to communicate with each other about the children. As one example, Truesdale obtained an individual education plan (IEP) for MH so that he could receive special services at school, but Howard did not support that decision. Also, in late 2022, CPS received two reports that Howard physically abused the children and, on January 4, 2023, the trial court ordered Howard to have supervised parenting time pending the outcome of the CPS investigation. Howard refused to participate in supervised parenting time, and claimed it would have caused the children emotional harm. Howard moved to reinstate his unsupervised parenting time after CPS specialist Erin Brooks could not substantiate the two

---

[1] The dissent would have held that, despite the trial court's legal error, clear and convincing evidence supported a change in the children's school enrollment and the frequency of parenting time exchanges. *Id*. (RONAYNE KRAUSE, J., dissenting) at 4.

allegations of child abuse. The trial court ruled that it would decide Howard's motion at the same time it addressed Truesdale's request for sole physical and legal custody of the children.

During four evidentiary hearings, the parties testified about their different parenting styles and their problems co-parenting the children. Between January 4, 2023 and the trial court's last evidentiary hearing on July 28, 2023, Howard refused to participate in his supervised parenting time. Truesdale testified that the children were both diagnosed with post-traumatic stress disorder (PTSD), but that they both improved when they did not see Howard. The trial court also conducted *in camera* interviews with the children.

On October 5, 2023, the trial court entered an opinion and order and ruled that, since June 2017, there was a change of circumstances that required it to reconsider the custody provisions in the divorce judgment. The trial court also ruled that, because Howard chose not to exercise his parenting time, the children had an established custodial environment with Truesdale. After considering the best-interest factors in the Child Custody Act (CCA), MCL 722.23, a majority of which weighed in favor of Truesdale, the trial court granted Truesdale sole legal and physical custody of AH and MH. The trial court also weighed the parenting-time factors in MCL 722.27a(7), and ordered weekly, supervised parenting time for Howard. Although the trial court recognized that CPS substantiated only two allegations of child abuse involving Howard, the court placed great weight on its own observation of Howard's aggressive behavior, his failure to visit the children in several months, and his admitted use of corporal punishment. The trial court also noted Howard's palpable animosity toward Truesdale and both parents' inability or unwillingness to co-parent the children. Finally, the trial court ruled that the children should remain in Oxford Community Schools where they were "thriving" and making friends within the school and their community. Howard's appeal of this order followed.

## II. STANDARDS OF REVIEW

We apply three standards of review in child custody cases. *Quint v Quint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368002); slip op at 3.

> The great weight of the evidence standard applies to all findings of fact. In a child custody dispute, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue. Specifically, we review under the great-weight-of-the-evidence standard the trial court's determination whether a party demonstrated proper cause or a change of circumstances. A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction. An abuse of discretion standard applies to the trial court's discretionary rulings such as custody decisions. An abuse of discretion, for purposes of a child custody determination, exists when the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. Questions of law are reviewed for clear legal error. A trial court commits legal error when it incorrectly chooses, interprets or applies the law. [*Merecki v Merecki*, 336 Mich App 639, 644-645; 971 NW2d 659 (2021) (quotation marks and citations omitted).]

-4-

"These three deferential standards of review are part of the Legislature's comprehensive effort to promote the best interests and welfare of children." *Sabatine v Sabatine*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 165279); slip op at 5 (quotation marks and citation omitted). When reviewing a trial court's custody decision, a reviewing court must remember that "trial courts are in a superior position to make accurate decisions concerning the custody arrangement that will be in a child's best interests." *Id*. at ___; slip op at 5-6, quoting *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994). As this Court further stated in *Sabatine*:

> Although not infallible, trial courts are more experienced and better situated to weigh evidence and assess credibility. Trial courts not only hear testimony and observe witnesses, but also may elicit testimony, interview children, and invoke other judicial resources to assure a thorough and careful evaluation of the child's best interests. [*Id*. at ___; slip op at 6 (citation omitted).]

III. CUSTODY

A. APPLICABLE LAW

Howard argues that the trial court improperly granted Truesdale sole legal and physical custody of AH and MH after deciding that there was a change of circumstances and that the children's established custodial environment was with Truesdale. We disagree.

The CCA "governs custody, parenting time, and child support issues for minor children in Michigan, and it is the exclusive means of pursuing child custody rights." *Barretta v Zhitkov*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket Nos. 364921 and 365078); slip op at 6 (quotation marks and citation omitted). "The purposes of the [CCA] . . . are to promote the best interests of the child and to provide a stable environment for children that is free of unwarranted custody changes." *Merecki*, 336 Mich App at 645 (quotation marks and citation omitted). The CCA "draws a distinction between physical custody and legal custody. . . ." *Id*. at 647. As this Court reiterated in *Barretta*:

> "[T]he Legislature divided the concept of custody into two categories— custody in the sense of the child residing with a parent and custody in the sense of a parent having decision-making authority regarding the welfare of the child." *In re AJR*, 496 Mich 346, 361; 852 NW2d 760 (2014), superseded in part by statute as stated *In re AGD*, 327 Mich App 332, 342; 933 NW2d 751 (2019). "Physical custody pertains to where the child shall physically reside, whereas legal custody is understood to mean decision-making authority as to important decisions affecting the child's welfare." *Grange Ins Co of Mich v Lawrence*, 494 Mich 475, 511; 835 NW2d 363 (2013). [*Barretta*, ___ Mich App at ___; slip op at 7.]

"As set forth in MCL 722.27(1)(c), when seeking to modify a custody or a parenting-time order, the moving party must first establish proper cause or a change of circumstances before the court may proceed to an analysis of whether the requested modification is in the child's best interests." *Lieberman v Orr*, 319 Mich App 68, 81; 900 NW2d 130 (2017). The threshold showing of proper cause or a change of circumstances must be established by a preponderance of the evidence. *Vodvarka v Grasmeyer*, 259 Mich App 499, 509; 675 NW2d 847 (2003). "[A] proper

cause or change in circumstance is a significant circumstance regarding one or more of the best-interest factors that has the potential for a significant effect on the well-being of the child or children whose custody is at issue." *Merecki*, 336 Mich App at 646 (footnote omitted).

As discussed, Howard challenges the trial court's finding of a change of circumstances to warrant modification of the judgment of divorce. To establish a change of circumstances, "the movant must prove by a preponderance of the evidence that since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a significant effect on the child's well-being, have materially changed." *Lieberman*, 319 Mich App at 81-82 (emphasis added; quotation marks and citation omitted). "[T]he evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child." *Vodvarka*, 259 Mich App at 513-514.

In *Vodvarka*, we addressed what evidence may be considered by the trial court in determining whether a significant change of circumstances has been demonstrated, and explained:

> Because a "change of circumstances" requires a "change," the circumstances must be compared to some other set of circumstances. And since the movant is seeking to modify or amend the prior custody order, it is evident that the circumstances must have changed since the custody order at issue was entered. Of course, evidence of the circumstances existing at the time of and before entry of the prior custody order will be relevant for comparison purposes, but the change of circumstances must have occurred after entry of the last custody order. As a result, the movant cannot rely on facts that existed before entry of the custody order to establish a "change" of circumstances. [*Id*. at 514 (footnote omitted).]

## B. CHANGE OF CIRCUMSTANCE

After the trial court entered the consent judgment of divorce, and especially after Howard moved to Southfield, Truesdale and Howard repeatedly involved the court system in their parenting disputes. Although each party blames the other for their discord, they are unable or unwilling to communicate or cooperate for the best interests of the children, as evidenced by their ongoing disagreements about where the children should attend school.

The parties also have markedly different approaches to parenting. Evidence showed that Truesdale encourages independence and communication, while Howard focuses more on his control over the children. CPS caseworkers investigated allegations of child abuse against Howard on multiple occasions. Although Howard is correct that CPS could not substantiate a number of allegations, Howard admitted that he physically disciplines the children and uses threats of corporal punishment. Howard minimized this behavior and refused to change it even though it clearly impacted his relationship with the children.

Evidence also showed that Howard regularly demeaned Truesdale while using aggressive and offensive language toward her. The children were aware of this behavior, and Truesdale repeatedly expressed a desire to protect herself and the children from Howard's conduct. Howard argued that Truesdale never actually feared him and simply used the allegation to alienate him

-6-

from the children. Howard forgets that the trial court observed Howard's aggressive rancor toward Truesdale first-hand. Further, even if Howard could show that Truesdale overstated her fear, Howard himself strained his bond with the children through his disciplinary decisions and his refusal to visit them after January 4, 2023. Those decisions cannot be attributed to Truesdale who strengthened her bond with the children by providing them safety and stability.

We agree with the trial court that Truesdale established, by a preponderance of the evidence, that conditions related to the custody of the children materially changed between June 2017, and October 2023, and that these changes had a significant impact on the children's well-being. See e.g., *Quint*, ___ Mich App at ___; slip op at 4 (finding proper cause where the "defendant's behavior led to police involvement," and the defendant's behavior "upset the child"). We also agree that, given the parties' antagonistic relationship, failing to revisit the custody order would have a significant negative effect on the well-being of the children. See *Dailey v Kloenhamer*, 291 Mich App 660, 666-671; 811 NW2d 501 (2011) (finding change of circumstances or proper cause existed to revisit the joint legal custody order because of the parties' "escalated and expanded" disagreements that "could have a significant effect on the child's well-being" and affirming the trial court's grant of sole legal custody to the father). The trial court's finding of a change of circumstances was not against the great weight of the evidence.

## C.  ESTABLISHED CUSTODIAL ENVIRONMENT

We also disagree with Howard that the trial court erred in finding the children's established custodial environment was with Truesdale. "If the movant seeking to change custody . . . successfully establishes proper cause or a change of circumstances under the applicable framework, the trial court must then evaluate whether the proposed change is in the best interests of the child. . . ." *Lieberman*, 319 Mich App at 83. "Before making a custody determination, the trial court must determine whether the child has an established custodial environment with one or both parents." *Bofysil v Bofysil*, 332 Mich App 232, 242; 956 NW2d 544 (2020).

An established custodial environment depends upon a custodial relationship of a significant duration in which [the child is] provided the parental care, discipline, love, guidance and attention appropriate to his age and individual needs; an environment in both the physical and psychological sense in which the relationship between the custodian and the child is marked by qualities of security, stability and permanence.

\* \* \*

When considering an important decision affecting the welfare of the child, the trial court must first determine whether the proposed change would modify the established custodial environment of that child. In making this determination, it is the child's standpoint, rather than that of the parents, that is controlling. If the proposed change would modify the established custodial environment of the child, then the burden is on the parent proposing the change to establish, by clear and convincing evidence, that the change is in the child's best interests. Under such circumstances, the trial court must consider all the best-interest factors because a case in which the proposed change would modify the custodial environment is

essentially a change-of-custody case. On the other hand, if the proposed change would not modify the established custodial environment of the child, the burden is on the parent proposing the change to establish, by a preponderance of the evidence, that the change is in the child's best interests. [*Sabatine*, ___ Mich at ___; slip op at 6-7 (quotation marks and citations omitted).

When the pre-separation "custodial environment no longer exits, the relevant point in time for purposes of determining whether an established custodial environment exists is at the time the trial court makes its custody determination." *Id*. at ___; slip op at 7-8.

As of October 5, 2023, the trial court correctly found that the children's established custodial environment existed solely with Truesdale. Evidence showed that Howard strained his relationship with the children because of the manner in which he parented them. Truesdale testified that Howard did not make sure the children did their homework during his weeknight parenting time, and the trial court found that Truesdale gave credible testimony. In January 2022, the trial court suspended Howard's parenting time so CPS could investigate an allegation of child abuse. When his parenting time resumed in June 2022, Howard took no responsibility for his conduct, he refused to change his behavior, and he instead accused Truesdale of "stealing" the children. In November 2022, and December 2022, CPS had to investigate two additional claims of child abuse. Although CPS could not substantiate those specific allegations, as discussed, Howard refused to visit the children during the investigation, he admitted to using and threatening corporal punishment, and he used vulgar language and aggressive behavior toward Truesdale around the children. In contrast, the children were doing well in Truesdale's full-time care because she ensured that their physical, emotional, and educational needs were met and she provided them with safety and stability. Also, evidence showed that the children's behavior and emotional wellbeing improved after Howard stopped exercising his parenting time.

This evidence supported the trial court's finding that the children felt more secure in their relationship with Truesdale, she was the only parent taking care of the children for a significant period of time, and they looked to Truesdale "for guidance, discipline, the necessities of life, and parental comfort." See MCL 722.27(1)(c). Thus, the trial court correctly ruled that the children's established custodial environment was with Truesdale.

D. BEST INTERESTS OF THE CHILDREN

Once the trial court correctly found the established custodial environment was with Truesdale, to support an order giving Truesdale sole legal and physical custody of the children, she had to show by a preponderance of the evidence that the custody change was in the best interests of the children. *Shade v Wright*, 291 Mich App 17, 23; 805 NW2d 1 (2010) (citations omitted).

Trial courts must decide whether joint custody is in a child's best interests by examining the best-interest factors stated under MCL 722.23, MCL 722.26a(1)(a), and by determining whether the "parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child," MCL 722.26a(1)(b). See also *Dailey*, 291 Mich App at 667. "[T]he trial court . . . must make specific findings of fact regarding each of the 12 statutory best-

interest factors." *Quint*, ___ Mich App at ___; slip op at 4-5 (second alteration in original; quotation marks and citation omitted).

In this case, the trial court made its custody decision after considering the best-interest factors and the facts and circumstances of the case. Howard does not challenge any of the trial court's findings regarding those factors, but instead argues that the trial court should not have made the custody ruling when CPS failed to substantiate the allegations of child abuse from November and December 2022.

This Court has held that "[i]f two equally capable parents whose . . . relationship has irreconcilably broken down are unable to cooperate and to agree generally concerning important decisions affecting the welfare of their children, the court has no alternative but to determine which parent shall have sole custody of the children." *Bofysil*, 332 Mich App at 249 (quotation marks and citation omitted). Also, when parents have a "deep-seated animosity" that causes them to have an "irreconcilable divergence in their opinions about how to foster [the] child's well-being," joint custody ceases to be an option. *Wright v Wright*, 279 Mich App 291, 299-300; 761 NW2d 443 (2008), citing MCL 722.26a(1)(b). In *Kuebler v Kuebler*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362488); slip op at 29-30, this Court reversed a trial court's decision to grant joint legal custody because the evidence established that the parties could not "communicate and make joint decisions regarding the children" and frequently required third-party and court involvement.

For similar reasons, the trial court did not abuse its discretion when it awarded Truesdale sole legal and physical custody of the children. The trial court recognized the parties' antagonistic relationship, Truesdale's fear of Howard because of his aggressiveness, and the parties' demonstrated inability to agree on issues about the children. Howard ignored at least one of the trial court's orders to use Our Family Wizard, a messaging program designed to foster healthy communication between the parties. Evidence showed that Truesdale regularly used the program, but Howard deliberately disabled his account. The parties also repeatedly asked the trial court to intervene because they could not agree about where the children should attend school. The record discloses no suggestion that the parties will be able to communicate effectively in the future or work together for the children's benefit. Indeed, both parties testified about their failed attempts to co-parent after the court entered the 2017 consent judgment. Truesdale also testified that she did not believe that Howard would benefit from therapy unless he took responsibility for his actions, which he had yet to do in matters related to the children.

In light of this record it would have been improper for the trial court to grant joint physical custody of the children because evidence showed they needed stability that Howard would not or could not provide. When in Truesdale's care during the school week, the children completed their homework, slept more, and took the bus to school. In contrast, while in Howard's care, the children had to wake up much earlier so that Howard's father could drive them to school and the children were involved in motor vehicle accidents in the process and, on another occasion, Howard's father ran over MH's foot. The children also feared Howard because of his aggressive parenting style. Indeed, the record reflects that Howard regularly declined to put the children's needs first, as evidenced by his parenting choices, his failure to exercise parenting time, and his unwillingness to communicate with Truesdale about the children.

As he did in the trial court proceedings, on appeal, Howard continues to blame Truesdale for alienating the children. We find it concerning that Howard minimizes the damage his actions have had on the children, and he fails to appreciate that it would take considerable time and effort to rectify that damage and rebuild trust. Although Howard's participation in the custody proceedings shows he wants to fight to reestablish a relationship with the children, nothing in the record shows that he is doing so with a goal of doing what is best for them. The CCA requires trial courts to focus on the children " 'to promote the best interests of the child and to provide a stable environment for children that is free of unwarranted custody changes.' " *Lieberman*, 319 Mich App at 78, quoting *Pierron v Pierron*, 282 Mich App 222, 243; 765 NW2d 345 (2009), aff'd 486 Mich 81 (2010). See also *Eldred v Ziny*, 246 Mich App 142, 150; 631 NW2d 748 (2001) ("Above all, custody disputes are to be resolved in the child's best interests.").

Evidence showed that the children were doing well and developing in Truesdale's care, that joint custody would cause the children further harm, and that it would not be in their best interests given the parties' protracted acrimony. See *Fisher v Fisher*, 118 Mich App 227, 233-234; 324 NW2d 582 (1982) (declining "to disturb the trial court's denial of joint custody" where "an award of joint custody would . . . be injurious to the children"). Accordingly, the trial court did not abuse its discretion by awarding Truesdale sole legal and physical custody of the children.

## IV. PARENTING TIME

Howard also disputes the trial court's ruling that his parenting time must be supervised. Again, we disagree.

"When determining whether a proposed change to parenting time would alter an established custodial environment, an important consideration is to what extent the proposed change will decrease a parent's time with the child." *Barretta*, ___ Mich App at ___; slip op at 7. "[M]inor modifications that leave a party's parenting time essentially intact do not change a child's established custodial environment, [but] significant changes do." *Id*. at ___; slip op at 7-8 (alterations in original; quotation marks and citation omitted). If only a change to the parenting-time schedule is at issue, the moving party must "prove by a preponderance of the evidence that the change [is] in the best interests of the children." *Lieberman*, 319 Mich App at 89.

In this case, Truesdale moved the trial court to change the parties' parenting-time schedule under the judgment of divorce and also asked that Howard's parenting time be supervised. The trial court found Truesdale's proposed parenting-time schedule would not alter the established custodial environment, which only existed with Truesdale. For the reasons discussed, the trial court did not err in ruling on the established custodial environment. Therefore, Truesdale was required to establish "an appropriate ground for taking legal action." See *Stoudemire*, 344 Mich App at 43 (quotation marks and citation omitted). Normal life changes may be sufficient to modify parenting time under such circumstances. *Shade*, 291 Mich App at 31.

As discussed, the conditions surrounding custody of the children materially changed between June 2017, and October 2023. The parties' conflict increased, and this impacted their ability to make joint decisions about the children. Howard's relationship with the children also changed. Indeed, the children feared Howard, their lives were disrupted by CPS investigations, and their bond was strained by Howard's refusal to participate in supervised parenting time. These

facts establish there was "an appropriate ground for taking legal action," because there was a change of circumstances that warranted an analysis of whether a modification to parenting time was in the children's best interests. See *Stoudemire*, 344 Mich App at 43 (quotation marks and citation omitted).

"The CCA recognizes that parenting time is not merely a right of the parent, but also a right of a child and thus an obligation of the parent." *Barretta*, ___ Mich App at ___; slip op at 11 (quotation marks and citation omitted). "Parenting time shall be granted in accordance with the best interests of the children. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents." MCL 722.27a(1). "Visitation shall be granted if it is in the best interests of the child and in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent." *Booth v Booth*, 194 Mich App 284, 292; 486 NW2d 116 (1992). But the law does not require a fifty-fifty split in parenting time. *Diez v Davey*, 307 Mich App 366, 390; 861 NW2d 323 (2014). It is not the sheer quantity of parenting time awarded to a parent that matters; it is whether the parenting-time schedule is in the child's best interests. *Berger v Berger*, 277 Mich App 700, 716; 747 NW2d 336 (2008). "The Michigan Parenting Time Guideline recognizes that there are myriad parenting-time arrangements available depending on what will serve the best interests of the children." *Diez*, 307 Mich App at 391.

"A trial court may use both the statutory best interest factors in the [CCA], MCL 722.23, and the factors listed in the parenting time statute, MCL 722.27a[(7)] when deciding whether to award parenting time." *Sturgis v Sturgis*, 302 Mich App 706, 710; 840 NW2d 408 (2013) (alteration and quotation marks omitted). The trial court in this case did so before ordering that Howard would have supervised parenting time once a week. Again, Howard does not challenge the trial court's findings under the parenting-time statute and does not specifically challenge any of the best-interest factors. Rather, Howard again disagrees with the trial court's ruling because CPS did not substantiate the 2022 allegations of child abuse against him.

However, the child's best interests govern a court's decision regarding parenting time. *Berger*, 277 Mich App at 716. "A parenting time order may contain any reasonable terms or conditions that facilitate the orderly and meaningful exercise of parenting time by a parent," including "that parenting time occur in the presence of a third person or agency." MCL 722.27a(9)(f). This provision allowing for the imposition of reasonable conditions on parenting time must be read in harmony with MCL 722.27a(3), which provides that "[a] child has a right to parenting time with a parent unless it is shown on the record by clear and convincing evidence that it would endanger the child's physical, mental, or emotional health." See *Butters v Butters*, 342 Mich App 460, 472; 995 NW2d 558 (2022) (alteration in original, quotation marks and citation omitted), vacated in part on other grounds 510 Mich 1096 (2022).

In this case, Howard used and threatened corporal punishment of the children, he used aggressive language with them, and he demeaned Truesdale in front of the children. Although CPS could not substantiate the allegations of abuse from late 2022, the children were nonetheless afraid of Howard because of his behavior. Further, although the court suspended Howard's parenting time in the past under similar circumstances, he did not change his behavior after his parenting time was reinstated in June 2022. Rather, as discussed, Howard blamed Truesdale and

-11-

took no responsibility for his own conduct. And, by October 5, 2023, Howard had not seen the children in the months because he refused to participate in supervised parenting time.

Nonetheless, the trial court acknowledged that the children love Howard and implicitly found that it was in the children's best interests to maintain a relationship with him. Because there was a risk Howard might harm the children psychologically or physically, the trial court ordered supervised parenting time. But the order also explicitly stated that it would consider granting Howard unsupervised parenting time in the future if he demonstrates that he has addressed the court's concerns. The record evidence supports the trial court's finding that Howard should not have unsupervised parenting time and the court's changes to the parenting-time schedule were necessary for the children's best interests, while also promoting a healthier relationship with Howard.

Affirmed.

/s/ Anica Letica
/s/ Kristina Robinson Garrett
/s/ Kathleen A. Feeney